UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALONDRA Y. RIVERA,

                     Plaintiff,

        -v-

TARGET CORP., *et al.*,

                     Defendants.

24-CV-6965 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

    Plaintiff Alondra Rivera brings this employment discrimination case against her former employer Target Corporation, one of its divisions, Roundel (collectively, "Target"), her former supervisor, Quinn Nelson, and several Human Resources employees. Rivera asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101 *et seq.* Before the Court is Defendants' motion to dismiss the complaint. For the reasons that follow, that motion is granted.

**I.    Background**

    **A.    Factual Background**

    The following facts, taken from Rivera's complaint and opposition to the motion to dismiss (ECF Nos. 1 ("Compl."), 27 ("Opp.")), are presumed true for the purposes of this Opinion. *See Davila v. Lang*, 343 F. Supp. 3d 254, 266-67 (S.D.N.Y. 2018). The Court assumes the parties' familiarity with the allegations in this case, and recites them only as necessary to resolve the predominantly procedural issues raised by the present motion.

Rivera was hired on or around August 22, 2022 by Roundel as an Account Manager. (Compl. at 7.) At that time, she was the only person in her department who identified as a "queer African-American and Hispanic" woman, and she "regularly shared" with others that she lived with and was in a romantic relationship with another woman. (*Id.*) Nelson began working as Rivera's supervisor in January 2023, and, over the next several months, criticized Rivera's qualifications and work performance in ways that Rivera alleges were discriminatory and hostile. (*Id.* at 9-10.) Nelson also allegedly increased Rivera's workload and "required Ms. Rivera to respond to every virtual and electronic communication she receive[d] across all work platforms[,] including but not limited to emails and messages on Slack[,] within 24 hours in addition to completing her daily and weekly job tasks to satisfactory standards." (*Id.* at 9.)

Beginning in July 2023, Rivera made a series of complaints to Roundel's Human Resources department regarding Nelson's treatment, none of which—to Rivera's disappointment—resulted in corrective action. (*See id.* at 10-11.) But on or around October 23, 2023, Target placed Rivera on a performance improvement plan, citing "gaps in performance spanning from 6 months prior." (*Id.* at 11.) On October 30, 2023, Ramirez was approved for FMLA leave—according to her, "due to the emotional and mental distress caused by the hostile work environment created by Defendant Nelson." (*Id.*) While Rivera was on leave, Nelson "included an evaluation of Ms. Rivera's work performance during the months Defendant Nelson knew Ms. Rivera was on FMLA leave." (*Id.*) Nelson also emailed Rivera on her personal email account during that time, though Rivera does not allege the contents of either the performance evaluation or the email. (*See id.*)

Rivera alleges that her FMLA leave expired in April 2024, and that she extended her leave, using paid time off, to May 2024. (*Id.*) Then, from May 2024 to July 2024, Rivera made

several requests to Human Resources to return to work in a different position away from Nelson. (*Id.* at 11-12.) But Human Resources refused, repeatedly encouraging Rivera to return to her original position and explaining that no other position was available. (*See id.*) Around June 4, 2024, Rivera was placed on unpaid leave for refusal to return to work, and a few weeks later, her request to transfer to another position was again denied. (*Id.* at 12.) Around July 8, 2024, Rivera was informed that she had seven days to return to work or she would be terminated. (*Id.*) And despite Rivera's indicating on July 15, 2024 that "she was returning to work," Target terminated Rivera later that day because she "had not communicated with the Human Resources department and refused to return to the Account Manager position under Defendant Nelson's supervision." (*Id.*) The termination letter Rivera received did not state a reason for her termination. (*Id.*)

Since her termination, Rivera contends that Target has continued "inaccurately informing the New York State Department of Labor [] that she is ineligible for unemployment benefits because she voluntarily resigned from her position." (*Id.* at 17.) She contends, also, that "[i]n September and October 2024, Defendants attempted to involuntarily elect and enroll Plaintiff to pay out-of-pocket expenses for COBRA health benefits from May 2024 through August 2024," and that "[s]ince filing her complaint," she "has continued to receive monthly medical bills from Defendants stating that she has an outstanding balance for alleged benefits coverage through July 27, 2024." (Opp. at 13.) That is despite Rivera's contention that she "was entitled to full coverage under Defendants' policy until July 27, 2024." (*Id.*) Those bills have statement dates ranging from June 10, 2024 to December 11, 2024. (*Id.* at 45-50.)

B.  **Procedural Background**

Rivera filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 30, 2024. (ECF No. 25-1 ("EEOC Charge").) On June 7, 2025, the EEOC notified Rivera that it would not proceed further with an investigation of her claims,

3

instead issuing a notice of her right to sue ("NRTS") within 90 days. (Compl. at 27.) Rivera then commenced this action on September 6, 2024. (Compl.) Defendants moved to dismiss on January 27, 2025 (ECF No. 23) and filed a memorandum of law in support (ECF No. 25 ("Mem.")). Rivera filed an opposition to the motion on February 19, 2025.[1] (Opp.) Defendants replied in further support of their motion on February 26, 2025. (ECF No. 28 ("Reply").)

## II.     Legal Standards

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must include enough facts to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true but need not accept as true "mere conclusory statements" reciting the elements of a cause of action. *See id.* at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). A complaint that pleads facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted).

That said, Rivera is proceeding *pro se*. "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (quotation

---

[1] Rivera styled her opposition as a "cross motion for summary judgment." As no scheduling order has issued and the parties have not completed any discovery, summary judgment briefing is premature. However, Rivera's filing exclusively makes arguments in opposition to the motion to dismiss, which is how the Court construes her submission for present purposes. Rivera also moved to file her opposition under seal, arguing that it contains sensitive personal information relating to her disability and Defendants' criticism of her work performance. Neither is a basis for sealing, however, given the presumption of public access to court documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Likewise, Rivera's home address is a matter of public record as she is a *pro se* filer. The motion to file under seal is thus denied.

marks omitted). Accordingly, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks omitted). Still, "a *pro se* complaint must state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

Finally, in ruling on a motion to dismiss, courts "may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir.2005). Here, the filing of an EEOC charge is a necessary prerequisite to asserting a Title VII claim, and so the Court may consider the contents of Rivera's EEOC Charge as a document on which the complaint relies. *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). And even if that were not the case, the Court could take notice of the EEOC charge as a public record. *See Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198, 204-05 (E.D.N.Y. 2006).

### III.    Discussion

#### A.    Title VII

"In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter." *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) (citing 42 U.S.C. § 2000e-5(f)(1)); *see also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149-52 (1984) (per curiam) (requiring strict adherence to the 90-day deadline or satisfaction of enumerated exceptions). "While the 90-day rule is not a jurisdictional predicate, 'in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day.'" *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (2d Cir. 1984) (quoting *Rice v. New Eng. Coll.*, 676 F.3d 9, 11 (1st Cir. 1982)). And the rule

5

applies with equal force to *pro se* litigants, even when they miss the deadline by a single day. *See, e.g.*, *Baldwin*, 466 U.S. at 148, 152 (noting that the plaintiff initially attempted to file her suit without counsel); *Johnson*, 731 F.2d at 145-46 (affirming dismissal of a *pro se* Title VII complaint filed one day late); *Sanchez v. Nat'l Cleaning Co.*, 11 F. Supp. 2d 453, 455 (S.D.N.Y. 1998) (dismissing a *pro se* Title VII complaint filed 92 days after the plaintiff's receipt of a right-to-sue letter); *Wright v. N.Y. State Unified Ct. Sys.*, No. 14-CV-4360, 2016 WL 11472251, at *2-3 (E.D.N.Y. Feb. 3, 2016) (noting that the 90-day rule applies to *pro se* litigants and also that "for statute of limitations purposes, a *pro se* complaint will be deemed filed when received by the court's *pro se* office"). Rivera acknowledges these principles and admits that she filed her complaint one day late (Opp. at 19-20, 43), but seeks relief along two lines.

  First, Rivera argues that she is entitled to equitable tolling because the NRTS arrived in the evening on June 7, 2024. (Opp. at 20-21.) The Second Circuit has held that "the 90-day rule can be equitably tolled in certain situations." *South v. Saab Cars USA, Inc.*, 28 F.3d 9, 11 (2d Cir. 1994) (citing *Johnson*, 731 F.2d 143 at 146). That serves Title VII's remedial purpose by protecting plaintiffs from "excusable failure to meet the time requirement." *Johnson*, 731 F.2d at 146 (citing *Zipes v. Trans World Airlines, Inc.*, 456 U.S. 385, 398 (1982)). But not all failures are excusable, such as those caused merely by the plaintiff's lack of diligence, *Baldwin*, 466 U.S. at 151, particularly when the purported reason for failing to timely file occurred at the beginning of the 90-day period, rather than at the end of it, *see South*, 28 F.3d at 12 (noting that, in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990), "equitable tolling was not proper where plaintiff's attorney was out of the country when EEOC notice arrived"). Instead, only "rare and exceptional circumstance[s]" warrant setting aside the 90-day rule. *Zerilli-Edelglass v. N.Y.C.*

*Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)).

"The Second Circuit has held that the doctrine of equitable tolling may be applied (1) where the defendant acted fraudulently or otherwise lulled the plaintiff into failing to litigate her claim; (2) where the court led the plaintiff to believe that she had done all that was required of her; (3) where the government did not meet its statutory duty to advise the plaintiff of her right to bring suit within a certain time period after filing administrative charges; (4) where the plaintiff filed her pleading within the statutory period without realizing it was defective; or (5) where the plaintiff's motion for the appointment of counsel was pending." *McClendon v. Bronx Cnty. Dist. Att'ys Off.*, 764 F. Supp. 2d 626, 629 (S.D.N.Y. 2011) (citing *South*, 28 F.3d at 11-12).

Here, Rivera does not cite any of the above exceptional circumstances to justify her failure to comply with the 90-day limit, instead resting on the fact that she received the NRTS in the evening on June 7, 2024. To begin, that does not come close to the types of excusable delay—such as fraud, misleading by a court, or a pending appointment of counsel—that ordinarily warrant equitable tolling. That makes sense, as it is routine in litigation for filings to arrive late in the evening, which often has no effect on related deadlines. And contrary to Rivera's assertion now that the timing of the notice "severely reduce[d] her time available to respond until the next business day," her own documents show that she downloaded, apparently read, and emailed the EEOC questions about the NRTS on June 7, 2024. (*See* Opp. at 27 (requesting clarification regarding the notice of the right to sue in order to plan "the next steps on my end").) Rivera thus used the evening hours of June 7, 2024 to study and inquire about the notice she had received that day. And, regardless, the Federal Rules avoid the need to make difficult determinations about the timing of a litigant's receipt of a filing when the deadline is

7

stated in days (rather than hours), excluding from the time period's computation the date that triggers the deadline. *Compare* Fed. R. Civ. P. 6(a)(2)(A) (computing time stated in hours as beginning "immediately on the occurrence of the event that triggers the period") *with* Fed. R. Civ. P. 6(a)(1)(A) (computing time stated in days by "exclud[ing] the day of the event that triggers the period").

Rivera argues additionally that Defendants will not be prejudiced by excusing her failure to comply with the 90-day rule. But "[a]lthough absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviations from established procedures." *Baldwin*, 466 U.S. at 152. Because Rivera made use of the day on which she received an evening NRTS (a day not even counted in the computation of the 90-day deadline) and identifies no other exceptional circumstance, equitable tolling is inappropriate.

Second, Rivera argues that the 90-day period "should also be tolled by the 'continuing violation' doctrine." (Opp. at 21.) In particular, Rivera argues that Defendants continued their allegedly discriminatory course of conduct against her after the NTRS issued. "Whether the continuing violation theory can revive claims that are otherwise time-barred by a plaintiff's failure to act on a right-to-sue letter has not been decided by the Second Circuit. However, the First, Sixth, Seventh and Tenth Circuits as well as several district courts have found that a plaintiff may not rely on the continuing violation theory to revive time-barred claims." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 207 (E.D.N.Y. 2014) (collecting cases); *see also Serrano v. N.Y. State Dep't of Env. Conservation*, 714 F. App'x 90, 92 (2d Cir. 2018) (summary order) (noting that the Second Circuit has not yet reached the question). Indeed, "every district

court in the Second Circuit to have considered the issue has held that the 90-day rule does not contain a continuing violation exception." *LaFontant v. Neale*, No. 18-CV-23, 2019 WL 1953942, at *6 (S.D.N.Y. May 2, 2019) (noting that it is sensible for the continuing violation theory to toll the 300-day period to present a claim to the EEOC, for it may take time for a plaintiff to notice a pattern of discriminatory content, but not the 90-day period to sue after receiving an NRTS, when a plaintiff necessarily already knows of the defendant's conduct).[2]

Because Rivera has not satisfied the requirements for equitable tolling, and because the continuing violation doctrine does not extend the time to file after receipt of an NRTS, the Title VII claim is dismissed as untimely.

### B. ADA

Like with Title VII, a plaintiff must file a charge of discrimination with the EEOC before asserting an ADA employment discrimination claim in federal court. *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016) (citing 42 U.S.C. § 12117(a) and *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006)). Rivera does not dispute that her EEOC

---

[2] To the extent that Rivera seeks to assert a Title VII claim—for allegations postdating the issuance of the NRTS—that is separate from the claim raised in the EEOC charge, she is required to separately exhaust that claim through the EEOC's administrative process. *See Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018) ("Before an aggrieved party can assert a Title VII claim in federal court, he is generally required to exhaust the administrative remedies provided by the statute."). The Second Circuit has recognized that sometimes a party is not required to "separately re-exhaust new violations that are 'reasonably related' to the initial claim" presented to the EEOC, but that leniency is not afforded to litigants who fail to commence their action on the original exhausted claim within the 90-day period. *Id.* at 622 ("[I]f a plaintiff has already filed an EEOC charge, we have been willing to assume that the exhaustion requirement is also met for a subsequent claim 'alleging retaliation by an employer against an employee for filing an EEOC charge.' . . . But because the conduct about which Duplan complains occurred after the conclusion of the agency's investigation and because Duplan did not file suit within 90 days of receiving a right-to-sue letter on his 2011 complaint, accepting Duplan's argument would be a significant and unwieldy extension of our existing precedent, and one we now reject.").

charge does not include a specific assertion of disability discrimination. (*See* Opp. at 24-25; EEOC Charge at 2.) Instead, Rivera argues that that ADA claim is "reasonably related to the claims filed with the EEOC." (Opp. at 24 (quoting *Kelly v. N. Shore-Long Island Jewish Health Sys.*, 166 F. Supp. 3d 274, 288 (S.D.N.Y. 2016).) The Second Circuit "has recognized that a claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Williams*, 458 F.3d at 70 (cleaned up). "In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (cleaned up). Rivera's EEOC charge alleged the following:

> I. I began employment with Respondent in or about August 2022, as an Account Manager remotely from my home in New York. During my employment, I was given less support than coworkers not of my protected class, harassed, subjected to different terms and conditions of employment and disciplined. I made complaints about uncomfortable and unwanted conduct to my direct supervisor. I complained about the treatment from my direct supervisor to Human Resources. Thereafter, Respondent presented me with a performance improvement plan. My concerns were never addressed.
>
> II. I believe I was discriminated against based on my race/national origin (Black and Hispanic) and in retaliation for engaging in protected activity in violation of title VII of the Civil Rights Act of 1964, as amended.

(EEOC Charge at 2.)

Rivera's allegations before the EEOC made no reference to disability discrimination, referring exclusively to adverse treatment "based on [her] race/national origin." But "courts have consistently found that claims of race discrimination are not reasonably related to claims of disability discrimination." *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 440-41 (S.D.N.Y. 2023) (collecting cases). That flows naturally from the more general principle, recognized by most courts in the Second Circuit, that "claims alleging discrimination

10

based upon a protected classification which are different than the protected classification asserted in administrative filings are not reasonably related." *Shands v. Lakeland Cent. Sch. Dist.*, No. 15-CV-42260, 2017 WL 1194699, at *4 (S.D.N.Y. Mar. 30, 2017) (quotation marks omitted) (collecting cases). Moreover, Rivera's theory of disability discrimination—concerning Defendants' alleged failure to reassign her to accommodate her anxiety—is drastically different than her theory of race discrimination—based on supposed mistreatment relative to similarly situated employees of other races. (*See* Compl. at 20-21.) Accordingly, because Rivera did not present her disability discrimination claim to the EEOC, and the claim is not reasonably related to the allegations that she did include in her EEOC charge, the ADA claim is dismissed for failure to exhaust.

### C. FMLA

"The FMLA gives eligible employees an 'entitlement' to twelve workweeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA generally requires an employee to be reinstated to the position she held, or an equivalent, at the time the leave began, so long as the employee is able to perform the essential functions of the position upon returning. *See id.* (citing 29 U.S.C. § 2614 and its implementing regulation, 29 C.F.R. § 825.214(b)); *see also Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999) (summarizing the applicable FMLA standards).

The FMLA also makes actionable interference with the right to take unpaid leave. "To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (citing 29 U.S.C. § 2615(a)(1)). That

11

requires the plaintiff to show "1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Id.* (formally adopting the standard set forth in *Achille v. Chestnut Ridge Transp., Inc.*, 584 F. App'x 20, 21 (2d Cir. 2014) (summary order)).

Rivera's FMLA interference claim fails at the outset because her complaint alleges that she received all of the FMLA leave that was owed to her. (*See* Compl. at 11.) The only other purported interference she suffered was an email from Nelson to her personal email while she was on leave (*id.*) and the entry of a professional evaluation into her file during that time (*id.*). Neither interfered with Rivera's ability to take her leave. In fact, Rivera does not allege that the email contained anything negative or that the evaluation was critical of her performance. Although it is far from clear that those facts could plausibly support an actionable FMLA interference claim, Rivera's failure to allege even that further underscores the lack of any plausible interference here. Accordingly, the FMLA interference claim is dismissed.

A plaintiff may also assert a claim for retaliation in connection with her FMLA rights. "To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Id.* at 429 (cleaned up) (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012)). Rivera asserts that Target retaliated against her by "terminating her employment a few weeks after she exhausted her FMLA and PTO benefits." (*Id.* at 24.) Termination unquestionably constitutes an

adverse employment action. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 167 (2d Cir. 2017) ("FMLA retaliation claims . . . [alleging] terminations for exercising FMLA rights . . . are actionable under § 2615(a)(1)."). And Target does not contest that Rivera was qualified for her position or that she exercised rights protected under the FMLA. (*See* Mem. at 23-24.) So, all Rivera must plausibly allege at this stage is that "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Cf. Graziado*, 817 F.3d at 424. That inference may be established "(i) indirectly through a showing that the protected activity was followed closely by discriminatory treatment, commonly known as 'temporal proximity;' (ii) indirectly through other evidence such as disparate treatment of similarly-situated employees; or (iii) directly through a showing of evidence of retaliatory animus toward plaintiff by defendant." *Landolfi v. Town of N. Haven*, No. 22-CV-770, 2024 WL 3925332, at *8 (D. Conn. Aug. 23, 2024) (quoting *Alexander v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 107 F. Supp. 3d 323, 328-29 (S.D.N.Y. 2015)). Rivera's complaint does not plausibly allege such an inference under any theory.

Take temporal proximity first—here, the time between Rivera's return from FMLA leave and her firing in July 2024. (*See* Compl. at 11.) Courts in this Circuit generally consider "two to three months between the protected activity and the adverse employment action" to be "the outer limit" of a temporal gap that could raise a plausible inference of retaliation. *Landolfi*, 2024 WL 3925332, at *8 (quoting *Kim v. Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012)). The precise timing in this case is difficult to follow. Rivera alleges generally that her period of FMLA leave ran from October 2023 through April 2024. (Compl. 11.) She alleges that she then sought and was granted use of her paid time off to extend the period of leave through May 2024. (*Id.*) And she was terminated on July 15, 2024. (*Id.* at 12.)

13

But the period running from October 2023 to April 2024 is at least twenty-two weeks (and likely more)—nearly double the amount of leave provided for by the FMLA. Defendants point out this discrepancy (*see* Mem. at 23 n.8), and Rivera's only response is that she disagrees with Defendants' calculation, with a concession that "she made requests for accommodations for three months after her return from FMLA leave leading up to her termination." (Opp. at 35.) The Court is, of course, bound to draw all plausible inferences in Rivera's favor at this stage, though it is unclear what beneficial inference would explain the discrepancy, other than that the allegation of her FMLA leave beginning in October 2023 is simply inaccurate. The more obvious explanation, supported by a letter Rivera submits from Target regarding her leave, suggests that the period from January to April 2024 was covered by leave stemming from some other source of benefits in addition to the FMLA. (*See id.* at 39.) But even assuming that Rivera was somehow entitled to FMLA leave for twice the time of the typical claimant or protected from firing during her paid time off, even the three months between May and July 2024 would be too long to raise an inference of retaliation, as it is at the high end of the "outer bound" of the period of time sufficient to generate such an inference. *Landolfi*, 2024 WL 3925332, at *8. And all of that reconstructing of the complaint aside, where a plaintiff's complaint is vague as to the timing of engagement in protected activity, that serves as an additional mark against an inference of retaliation based on temporal proximity. *See Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 573-74 (S.D.N.Y. 2023) (collecting cases). Furthermore, Rivera alleges a course of supposedly adverse conduct "[e]very week for 20 months" while she worked under Nelson. (Compl. at 15.) "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an

inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). That further undermines any inference of retaliation.

Next, Rivera cannot proceed on the second theory of retaliatory inference arising from disparate treatment of similarly situated employees, as she does not allege that any such employees exist or were fired (let alone faced any adverse consequences) for exercising FMLA leave. Indeed, she does not allege that any other employee ever took FMLA leave.

As to explicit evidence of retaliation, Rivera's allegations actually undercut any inference of animus, as she alleges that Defendants repeatedly encouraged her to return to work for Nelson following the conclusion of her FMLA leave. For example, Rivera alleges that "Defendant Human Resources . . . attempt[ed] to coerce Ms. Rivera into working with [Defendant Nelson] while Ms. Rivera pleaded to be moved." (Compl. at 16.) Moreover, Rivera alleges that Human Resources informed her that "she would be unable to find a job in as quickly as a day so she should work with Defendant Nelson regardless of the reports she made." (*Id.* at 17.) Not only do those allegations preclude Rivera from proceeding on a theory of explicit retaliatory motive, but they also further diminish any retaliatory inference that may be drawn from the timing of her termination.

No more availing are Rivera's allegations of retaliation following her termination, including the reduction in her healthcare and unemployment benefits (*see id.* at 12, 17), because they are even further attenuated from her taking FMLA leave and are similarly undercut by her own allegations that Defendants encouraged her to return to her position. And, critically, the post-termination allegations concern actions Defendants took prior to Rivera's commencement

15

of this litigation,[3] so there is no inference to be made that she was retaliated against for suing Defendants under the FMLA. Thus, the pre-termination allegations, like her termination itself, do not raise an inference of retaliation actionable under the FMLA.

Because Rivera's complaint raises no plausible inference of retaliation, and actually contains several allegations undercutting such an inference, the FMLA retaliation claim is dismissed.

### D.     Leave to Amend

The Second Circuit has made clear that "[d]istrict courts should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend." *Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013) (summary order) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). However, a Court need not grant leave to amend when amendment would be futile. *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). Here, any amendment of the Title VII or ADA claims would be futile, as they are dismissed not for an insufficiency of factual allegations, but for being untimely and unexhausted, respectively. *See supra* Sections III.A., III.B. Rivera is therefore denied leave to amend her Title VII and ADA claims. However, the Court dismisses the FMLA claims for insufficient factual allegations. Therefore, Rivera may move for leave to amend her complaint by filing within four weeks of the date of this Opinion and Order a proposed amended complaint. Rivera may also file a letter within that time indicating that she

---

[3] Rivera alleges in her opposition to the motion to dismiss that she has received medical bills since the filing of the complaint. But the bills she attaches show issue or statement dates of August 5, 2024 (Opp. at 45), June 10, 2024 (*id.* at 47), July 10, 2024 (*id.* at 48), November 11, 2024 (*id.* at 49), and December 11, 2024 (*id.* at 50). Even under the most generous reading of Rivera's allegations of FMLA retaliation, the course of retaliatory conduct (the issuance of bills by a department of Defendant Target that has not been shown to be in any way related to individuals who processed Rivera's leave requests) began far before the commencement of this litigation. These allegations therefore fail to raise any inference of retaliation. *Slattery*, 248 F.3d at 95.

does not plan to amend her complaint, at which point the Court will enter final judgment, triggering Rivera's right to appeal to the United States Court of Appeals for the Second Circuit. Failure to file a letter within that time seeking leave to amend or to include in that letter a proposed amended complaint will result in entry of final judgment for Defendants.

### E. Remaining State-Law Claims

No federal-law claims remain in the action, and the complaint asserts only this Court's federal-question and supplemental jurisdiction as a basis to adjudicate the state-law claims, declining to assert the citizenship of any defendant. (Compl. at 2.) Rivera is a citizen of New York. (*Id.* at 3.) If any of the individual defendants is a citizen of New York, or if either Target Corporation or Roundel is incorporated in or has its principal place of business in New York, complete diversity will not exist among the parties. *See* 28 U.S.C. § 1332(a). Because it is ordinarily proper to decline to exercise supplemental jurisdiction over remaining state-law claims following the early dismissal of all federal-law claims, Rivera's NYSHRL and NYCHRL claims are dismissed without prejudice to refiling in state court. *See Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 511 (S.D.N.Y. 2015) ("Although the exercise of supplemental jurisdiction is discretionary, the ordinary case 'will point toward declining jurisdiction over the remaining state-law claims.'" (quoting *In re Merrill Lynch Ltd. P'Ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998))). Rivera may also move to amend her complaint, through the procedure identified in Section III.D of this Opinion and Order, alleging a basis for this Court's diversity jurisdiction.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Rivera's motion file her submission at ECF No. 27 under seal is DENIED.

The Clerk is directed to close the motions at ECF No. 23 and 26 and to lift the seal of ECF No. 27, but not to enter judgment of dismissal or close the case.

SO ORDERED.

Dated: June 6, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge